In re CENTRAL MORTGAGE &
TRUST, INC., Debtor.

CENTRAL MORTGAGE & TRUST,
INC., Plaintiff,

v.

STATE OF TEXAS, James L. Sexton,
Commissioner, Texas State Department
of Banking, and Wreno S. Wynne, Su-
pervisor, Defendants.

Bankruptcy No. 85–04102–H2–5.
Adv. No. 85–0568–H3.

United States District Court,
S.D. Texas,
Houston Division.

July 18, 1985.

J. Craig Cowgill and Karen Emmott, Houston, Tex., for plaintiff.

Marcy E. Kurtz and John H. Buck, Bracewell & Patterson, Houston, Tex., Jorge A. Gutierrez, Gen. Counsel, Texas Dept. of Banking; Edna I. Ramon, Asst. Atty. Gen., Austin, Tex., for the State of Texas, for defendants.

Allene D. Evans, Asst. Atty. Gen., for the State of Texas, for intervenor.

## MEMORANDUM OPINION AND ORDER

CAROLYN DINEEN RANDALL, Circuit Judge: *

This case raises the issue whether a mortgage and trust company, engaged in the business of originating and servicing mortgage loans and selling interests in pools of such loans to investors, may be a debtor under the Bankruptcy Code. For the reasons set forth herein, this court finds that the company does not fall within the list of entities that are precluded from seeking relief under the federal bankruptcy laws and therefore denies the defendants' motion to dismiss this case.

### I.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 5, 1985, the debtor, Central Mortgage and Trust, Inc. ("CMT"), filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. CMT is a Texas corporation organized pursuant to the provisions of article 4.07 of the Texas Business Corporation Act and article 1513a of the Texas Revised Civil Statutes. Two weeks before the filing of the Chapter 11 petition, the Texas Department of Bank-

ing took action that led ultimately to the issuance of an order closing CMT and requiring its liquidation. On June 20, 1985, having determined that CMT was in an unsafe condition that rendered its continued operation hazardous to the public or to its depositors and creditors, the Commissioner of the Texas Department of Banking, James L. Sexton, placed CMT under supervision and appointed Wreno S. Wynne to be supervisor of CMT. The next day, June 21, the State of Texas obtained in state court a temporary restraining order, enjoining CMT from dealing in securities, engaging in fraudulent practices in connection with the sale of securities, and disposing of corporate records or assets. On June 28, 1985, the Texas Banking Commissioner ordered the closure of CMT after finding that the interests of CMT's depositors and creditors were seriously jeopardized through insolvency or imminent insolvency and that it was in their best interests that CMT be closed and its assets liquidated.

After filing the Chapter 11 petition, CMT initiated the instant adversary proceeding, filing an "Emergency Motion for Injunction and Special Stay pursuant to Section 105 of Title 11, U.S.C. and Request for Expedited Hearing on Temporary Restraining Order and Preliminary Injunction and for Turnover of Books, Records, and Assets." CMT sought, *inter alia*, authorization to resume control of its day-to-day business affairs from the appointed supervisor, access to its books and records, the turnover of its books, assets, and records collected by the supervisor, and an order prohibiting liquidation of the corporation by the state, and, in the alternative, the appointment of John Signorelli, CMT's president and chairman of its board of directors, to manage and control the corporation jointly and equally with the supervisor. An expedited hearing on CMT's motion was set for July

---

* Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation. Pursuant to section 104(a) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 104(a), 98 Stat. 341 (to be codified at 28 U.S.C. § 157(d)), an order was entered in the United States District Court for

the Southern District of Texas withdrawing the reference in this case—then pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division—for the limited purpose of permitting the district court to enter this order.

12, 1985. Immediately prior to the hearing, the named defendants filed a Rule 12(b)(1), Fed.R.Civ.P., motion to dismiss for lack of subject matter jurisdiction and, in the alternative, answered CMT's motion urging that the requested relief be denied and raising the jurisdictional issue as an affirmative defense. The defendants also requested an expedited and consolidated hearing of their motion to dismiss and CMT's motion for injunction. In addition, Richard Latham, Commissioner of the Securities Board of the State of Texas ("Securities Commissioner"), sought to intervene in the matter. Granting the Securities Commissioner's motion to intervene, the court proceeded to limit the scope of the July 12 hearing to the threshold jurisdictional issue. The named defendants—the State of Texas, James L. Sexton, Commissioner, Texas State Department of Banking, and Wreno S. Wynne, supervisor—and the Securities Commissioner will be collectively referred to as the "state" throughout.

The state urges the dismissal of this bankruptcy case for four reasons. First, the state claims that this court lacks subject matter jurisdiction over this case under section 109(b)(2) of the Bankruptcy Code because CMT is a bank under the pertinent provisions of Texas law and is therefore specifically excluded from those entities that may seek relief in bankruptcy under Chapter 11. The state argues that, because Texas provides a regulatory scheme incorporating a liquidation mechanism for entities like CMT, and because CMT is treated under Texas law "as if it were a state bank," CMT should not be eligible for Chapter 11 bankruptcy relief.

Second, the state contends that CMT is not properly before this court as a debtor because the Chapter 11 petition was signed by John E. Signorelli, who lacked authority to act on behalf of CMT after the Banking Commissioner closed CMT. Upon closure, the Banking Commissioner acquired possession of CMT's assets for the purpose of liquidation and succeeded to the corporation's rights, including the right to file a petition in bankruptcy. The state asserts that the petition in bankruptcy represented an attempt by CMT to circumvent the procedures set out in the Texas Banking Code for contesting liquidation proceedings. *See* Tex.Rev.Civ.Stat.Ann. art. 342–805.

Third, the state asserts that, pursuant to section 305(a)(1) of the Bankruptcy Code, the interests of CMT's creditors and of CMT would be better served if this court dismissed this case or suspended all proceedings in connection with this case since the Banking Commissioner's control of CMT assures the orderly and organized liquidation of CMT in accordance with Texas law and in a manner which will provide the greatest return for CMT's creditors and other parties in interest.

Finally, the state asserts that the case should be dismissed because the bankruptcy petition was filed in bad faith as an attempt to circumvent the provisions of the TRO issued by the state court and the provisions of Texas law regarding the liquidation of banks.

CMT responds by asserting that it is eligible to be a debtor and reorganize under Chapter 11 of the Bankruptcy Code. CMT takes issue with the state's characterization of it as a bank. Conceding that it is chartered as a trust company, which is regulated to some extent by the Banking Commissioner, CMT argues that its trust activities are limited, with the focal point of its business being mortgage lending. Moreover, CMT was without banking privileges under article 1513a of the Texas Revised Civil Statutes and consequently lacked the essential attribute of a bank, viz., its ability to accept any deposit to be paid upon the depositor's order. Instead, CMT could accept "investment deposits" only if prior funded mortgage loans were in its possession essentially to act as collateral in backing the investment. Moreover, the investment deposits were not payable on demand but required the termination of the executed trust investment agreement before any funds could be retrieved. CMT further asserts that the Banking Commissioner does not regulate a trust company to the same degree that it regulates a bank. The lack of an extensive regulatory or liquidation scheme militates against finding

that CMT's business was public or quasi-public in nature. Finally, CMT argues that the Banking Commissioner's authority did not eviscerate the power of CMT's directors to file or authorize the filing of a petition in bankruptcy. Therefore, the Chapter 11 petition filed in the instant case was properly authorized.

At the hearing, primarily through the testimony of Signorelli, CMT's president, and an exhibit, which included CMT's articles of incorporation, it was established that CMT was engaged in the business of originating and servicing residential mortgage loans and selling interests in pools of such loans to investors. CMT was initially incorporated in February 1981 as Central Mortgage Acceptance, Inc., pursuant to the provisions of the Texas Business Corporation Act. The articles of incorporation were amended in May 1982 without import for our purposes. In September of 1982, however, the articles were amended and restated under the provisions of article 4.07 of the Texas Business Corporation Act and article 1513a of the Texas Revised Civil Statutes, changing the name of the corporation to Central Mortgage and Trust, Inc., and altering the purpose of the corporation to permit it to exercise the powers of a trust company under article 1513. Article Three of the amended articles provides:

> The purpose for which the corporation is organized is to engage in any business enterprise which is lawful in the State of Texas or elsewhere, and to act as trustee, executor, administrator, or guardian when designated by any person, corporation, or court to do so, and as agent for the performance of any lawful act, including the right to receive deposits made by agencies of the United States of America for the authorized account of any individual, and to act as attorney-in-fact for reciprocal or inter-insurance exchange, and to lend and accumulate money without banking privileges, when licensed under the provisions of Subtitle II of Title 79, Revised Civil Statutes of Texas, 1925, as amended, and shall have, in addition to all other powers conferred by law, the power to purchase, sell, discount and negotiate with or without its endorsement or guaranty, notes, drafts, checks, bills of exchange, acceptance, including banker's acceptances, cable transfers and other evidences of indebtedness; to purchase and sell, with or without its endorsement or guaranty, stocks, bonds, securities, including the obligations of the United States or of any state thereof; to issue debentures, bonds and promissory notes, to accept bills or drafts drawn upon it, but in no event having liabilities outstanding thereon at any one time exceeding five times its capital stock and surplus; provided, however, that with the consent in writing of the Banking Commissioner it may have outstanding at any one time ten times the capital stock and surplus; and generally to exercise such powers as are incidental to the powers conferred by Article 1530 V.C.S.

CMT was approved as a mortgagee by the Department of Housing and Urban Development (including the Federal Housing Authority and the Veteran's Administration), the Federal National Mortgage Association (Fannie Mae), and the Federal Home Loan Mortgage Association (Freddie Mac). In addition, CMT was an approved Government National Mortgage Association (GNMA) issuer and servicer eligible to participate in the GNMA mortgage-backed securities program. As such, CMT was authorized to apply to and receive from GNMA commitments to guarantee GNMA mortgage-backed securities and to issue such securities.

Signorelli testified that CMT performed "trust functions" under the rubric of its Investment Trust Deposits program. There was extensive testimony concerning the various steps contemplated in a typical full-circle transaction under this program. For the purposes of this inquiry, however, we need only concern ourselves with those portions of this testimony that bear upon the state's contention that the activities of CMT were substantially similar to those of a bank. In summary, CMT solicited funds from the public by various advertisements for investment in the Investment Trust Deposits program. The funds were used to

repay debt incurred by CMT in originating mortgage loans. When a sufficient pool of mortgage loans was built up, CMT sold interests in these loans to investors (apart from those who initially invested funds in CMT's Investment Trust Deposits program) through investment banking firms.

The state characterized the process as CMT receiving deposits from the initial investors. In this regard, the state places emphasis on those portions of the testimony that reflect that CMT accepted the investors' funds as deposits, that the funds could be withdrawn on demand, that CMT set aside 10% of all funds invested under the program as a self-imposed reserve requirement, that CMT advertised that invested funds would bear interest at a fixed rate over the term of the investment, and that CMT represented that the funds were federally insured. Whatever the invested funds may have been termed by CMT in its marketing literature, however, CMT was not authorized to accept deposits by its charter. Moreover, the funds were treated to a significant extent like investments in an ordinary business corporation. While trust language was used in some of the governing instruments, CMT's activities with regard to the Investment Trust Deposits program bear little resemblance to customary trust functions.

Signorelli testified that CMT was heavily regulated by the federal agencies with regard to its mortgage-lending activity, but that the Banking Commissioner had no authority in this regard. He did concede that the Banking Commissioner had authority to regulate CMT in connection with the exercise of its trust powers, but he observed that such regulation was minimal, consisting only of annual examinations of CMT and the requirement that CMT file annual financial statements.

The evidence demonstrated that a special meeting of CMT's Board of Directors was held on July 1, 1985, at which the directors authorized, should it become necessary, the filing of a petition in bankruptcy to protect CMT's assets and permit it to reorganize. *See* Plaintiff's Ex. 2.

Commissioner Sexton, highly articulate and with vast experience in the banking area, testified regarding Texas' regulatory scheme for companies like CMT. He listed the characteristics he associates with a bank as including accepting and paying deposits, making loans, representing itself as federally insured, maintaining reserves, and representing itself as a member of a banking association. He defined the term "deposit" as a sum placed with an entity upon which withdrawals could be made on demand or after notice.

Commissioner Sexton further testified, although somewhat inconsistently, that the regulation set up for trust companies was less extensive than that established for state-chartered banks. He noted that trust companies under article 1513a of the Texas Revised Civil Statutes are required to file annual financial statements, are subject to examination, and are subject to supervision by the Banking Commissioner as necessary. Further, Commissioner Sexton indicated that he had authority to appoint a conservator or to liquidate a trust company under specified conditions. He testified that he was empowered to regulate a trust company as if it were a state bank, citing article 1513a(2B). Moreover, Commissioner Sexton asserted that trust companies like CMT were encompassed in the Texas Banking Code's definition of "state bank," a conclusion with which we most respectfully disagree.

Commissioner Sexton testified that the effect of his order to close CMT was that CMT would have to be liquidated, converting its assets to cash and distributing the cash to CMT's creditors. Toward this end, the Banking Commissioner hired technical support to determine the financial condition of the company and to liquidate it. He indicated that at no time had he authorized anyone, including the directors of CMT, to file a Chapter 11 petition in bankruptcy or the instant adversary proceeding.

On cross-examination, Commissioner Sexton conceded that he had no authority to regulate a mortgage company. He further admitted that the acceptance of a deposit

by a state-chartered bank differed from the means by which an investor placed funds with CMT, which required "a greater flurry of activity." Commissioner Sexton indicated that the statutory scheme for liquidating a trust company provided no means for reorganization of the entity. He further stated that the Texas Department of Banking often relied on an audited statement of a trust company's financial condition in lieu of examination. Commissioner Sexton knew of only three other companies like CMT and stated that the state had liquidated only one trust company to date. Finally, Sexton characterized the transactions of CMT as public in large part because the company advertised its program in the media.

The issues raised by the parties will be addressed in turn.

## II.

## DISCUSSION OF THE LAW

### A. *Eligibility of CMT to be a Debtor*

Section 109 of the Bankruptcy Code provides that certain entities may not be debtors:

A person may be a debtor under chapter 7 of this title only if such person is not—

. . . .

(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union, or industrial bank or similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h))

. . . .

11 U.S.C. § 109(b)(2). Section 109(d) provides that "[o]nly a person that may be a debtor under chapter 7 of this title ... may be a debtor under chapter 11 of this title." The Code defines a "person" to include an individual, a partnership, or a corporation. 11 U.S.C. § 101(33). In determining whether an entity is excluded under section 109(b)(2) from being a debtor under the

Code, courts have employed two tests: (1) the state classification test and (2) the independent classification test. 2 Collier on Bankruptcy ¶ 109.02, at 109–13 (15th ed. 1985).

### 1. *The State Classification Test*

The appropriate framework for applying the state classification test has recently been articulated:

The state classification test involves examination of the entity's status under the law of the state of incorporation. If state law classifies the entity as one that is specifically excluded from being a debtor under section 109(b)(2), the inquiry generally ends there. If state law does not so classify the entity, the question becomes whether the entity is the substantial equivalent of those in the excluded class. The starting point in this analysis is a comparison of the powers conferred upon or withheld from the entity with the powers conferred upon or withheld from entities excluded under section 109(b)(2). The court also will examine the relevant statute to determine whether the entity, like those in the excluded class, is subject to extensive state regulation; is subject to express statutory procedures for liquidation or rehabilitation; and conducts business of a public or quasi-public nature.

*In re Cash Currency Exchange, Inc.,* 762 F.2d 542, 548 (7th Cir.1985) (citing *First American Bank & Trust Co. v. George,* 540 F.2d 343, 349 (8th Cir.), *cert. denied,* 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976)), *aff'g* 37 B.R. 617 (N.D.Ill.1984). Clarifying the limits of the state classification test, a leading commentator observes that, although the state classification test "is more favored by the courts, this does not mean that state law is followed literally without regard for the real activities of the corporation, particularly where the corporation has failed to utilize its charter or has developed into a different type of corporation." 2 Collier on Bankruptcy ¶ 109.02, at 109–14 (citing *In re Prudence Co.,* 79 F.2d 77 (2d Cir.1935), *cert. denied,* 296 U.S. 646, 56 S.Ct. 248, 80 L.Ed. 459 (1936)). More-

over, the mere fact that a state has provided for state supervision and liquidation of a certain kind of corporation does not necessarily place such a corporation into the excepted class. *See id.; Sims v. Fidelity Assurance Ass'n*, 129 F.2d 442 (4th Cir. 1942), *aff'd*, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943).

The Seventh Circuit, in a thorough opinion, has recently canvassed the case law discussing the elements that render a corporation the substantial equivalent of a bank. *See In re Cash Currency Exchange, Inc.*, 762 F.2d at 549–50. The court identified the power of an entity to accept deposits as the touchstone requirement. *Id.* Observing that an entity may be empowered to render some of the services provided by a bank and yet be found not to be the substantial equivalent of a bank, the Seventh Circuit held that a currency exchange authorized to cash checks and sell or issue money orders was not the substantial equivalent of a bank largely because the state statute creating the exchange expressly prohibited the acceptance of deposits by currency exchanges. *Id.* at 549.

Like the Seventh Circuit, we begin our analysis of the state-classification issue by recounting the seminal case of *Gamble v. Daniel*, 39 F.2d 447 (8th Cir.), *cert. denied*, 282 U.S. 848, 51 S.Ct. 27, 75 L.Ed. 752 (1930). In contrast to the specific entities listed as excluded under section 109(b)(2), section 4 of the Bankruptcy Act, *see, e.g.*, 11 U.S.C. § 22 (1976), excepted "banking corporations" from voluntary or involuntary bankruptcy.[1] The *Gamble* court interpreted the term "banking corporation" as used in section 4 as follows:

> [In 1910, at the time of the adoption of the "banking corporation" exception], the ordinary conception of a bank was of a business which was based primarily on the receipt of deposits (general or special), which deposits were used by the bank for loans, discounts, buying and selling commercial paper, and other business purposes.... The prime incentive in engaging in the business was the profit to be made, directly or indirectly, from the use of deposits. Most of the then existing state legislation concerning banks had as its principal purpose the protection of such depositors.
>
> Much of the right to regulate banks was the public interest in protecting depositors. Banking has been a development, and the above was its status in 1910. Other businesses might and did, and still do, deal in commercial paper, make loans or borrow money without any one thinking of them as banks. When a business takes deposits and then does the above or related things, every one knows it is doing a banking business. * * * *In short, while there may be other attributes which a bank may possess, yet a necessary one is the receipt of deposits which it may use in its business.*

39 F.2d 450–51 (emphasis added), *quoted in In re Cash Currency Exchange, Inc.*, 762 F.2d at 549–50. *Gamble* involved a trust company organized under Nebraska law with nearly all of the powers usually exercised by a bank, except receiving deposits, but prohibited from conducting the business of banking except in compliance with the provisions governing trust companies. Laying special emphasis upon the trust company's inability to accept deposits, the court held that it was not a "banking corporation" within the meaning of the state statutes or the Bankruptcy Act and could therefore be a debtor under the Act. In *Gamble*, the contention was made that, because the trust company was actually doing a banking business, it was a "banking corporation" under section 4 of the Bankruptcy Act. In rejecting this contention, the court observed that "it would be strange if Congress would permit the classification under section 4 (and, therefore, the application of the entire Act) to be

1. The Seventh Circuit noted that it relied upon cases interpreting section 4 because they were "clearly relevant to an understanding of the congressional policy underlying the exclusion," and because research "revealed no cases presenting the question whether a particular entity is the equivalent of one of the banking institutions now listed in section 109(b)(2)." *In re Cash Currency Exchange, Inc.*, 762 F.2d at 549 n. 9.

controlled by the exercise of ultra vires powers by a corporation." 39 F.2d at 450. The court concluded that "when Congress used the words 'banking corporations' it meant corporations which were *authorized by the laws of their creation to do a banking business.*" *Id.* (emphasis added).

In *In re Prudence Co.*, 79 F.2d 77 (2d Cir.), *cert. denied*, 296 U.S. 646, 56 S.Ct. 248, 80 L.Ed. 459 (1935), the Second Circuit held that an investment company, incorporated under the provisions of the New York Banking Law relating to such companies, was not a banking corporation under section 4 of the Bankruptcy Act. Although investment companies incorporated under the New York Banking Act could obtain all the powers of a bank, the particular investment company before the court had not done so. Judge Swan observed that "all of the cases ... which have construed the words 'banking corporation' as used in the Bankruptcy Act, have regarded the *legal power to receive deposits* as the essential thing." *Id.* at 77 (emphasis added). Hence, the investment company was not a banking corporation although it was incorporated under state banking law, it was subject to the supervision and reporting requirements of the state superintendent of banks, its advertising emphasized that it was subject to such supervision, and state law provided a procedure for liquidation.

The power to accept savings deposits, though not demand deposits, was enough in *First American Bank & Trust Co. v. George*, 540 F.2d 343 (8th Cir.), *cert. denied*, 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976), for the court to hold that the trust company was a banking corporation within the meaning of section 4 of the Bankruptcy Act and, consequently, precluded it from seeking relief in bankruptcy.

■ The formation and operation of Texas state banks are governed by the Texas Banking Code, Tex.Rev.Civ.Stat.Ann. arts. 342–101 to –913. In determining how Texas would characterize an entity such as CMT, we begin by examining the definition of "State Bank" under the Texas Banking Code. Article 342–102 defines "State Bank" as follows:

Any corporation hereafter organized under this Code, and any corporation heretofore organized under the laws of the State of Texas, and which was, prior to the effective date of this Act, subject to the provisions of Title 16 of the Revised Civil Statutes of Texas, 1925, as amended, including banks, trust companies, bank and trust companies, savings banks and corporations subject to the provisions of Chapter 9, Title 16 of the Revised Civil Statutes of Texas, 1925, as amended.

Under this definition, CMT is simply not a state bank. CMT was not organized under the Texas Banking Code. Nor was it organized prior to the effective date of the Texas Banking Act. Hence, the term "state bank," as defined in the Texas Banking Code, does not encompass an entity like CMT—a corporation originally organized in 1981 under the Texas Business Corporation Act and reorganized in 1982 under that Act and article 1513a of the Texas Revised Civil Statutes. The activities of the Texas Legislature in 1983 confirm this conclusion. In that year, the Legislature amended article 1513a to empower the Banking Commissioner to take action—whether by placing the trust company under supervision or conservatorship or in liquidation—against a trust company "as if it were a state bank," Act of June 19, 1983, ch. 499, § 5, 1983 Tex.Sess. Law Serv. 2928–29 (Vernon), an action which would not have been necessary if companies like CMT were encompassed within the definition of "state bank" in the Texas Banking Code.

Article 342–301 lists the powers that may be ascribed to a state bank. The first of the powers enumerated is the power "[t]o receive time and demand deposits at interest or without interest; to lend money with or without security at interest; and to buy, sell and discount bonds, negotiable instruments and other evidences of indebtedness...." *Id.* art. 342–301(a). The Texas Supreme Court has acknowledged that the substance of the business of a bank is to receive deposits, pay out on checks, and lend money, *see Brenham Production Credit Ass'n v. Zeiss*, 153 Tex. 132, 264

S.W.2d 95, 97 (1953), and that the most obvious purpose of a bank is to receive deposits. *Id.; see also Kaliski v. Gossett,* 109 S.W.2d 340, 344 (Tex.Civ.App.—San Antonio 1937, writ ref'd) (quoting *In re Prudence Co.,* 79 F.2d at 79).

Trust companies are governed by articles 1513 and 1513a of the Texas Revised Civil Statutes. Article 1513 provides that trust companies organized under Texas law are empowered

to purchase, sell, discount, and negotiate with or without its endorsement or guaranty, notes, drafts, checks, bills of exchange, acceptances, including bankers' acceptances, cable transfers and other evidences of indebtedness; to purchase and sell, with or without its endorsement or guaranty, stocks, bonds, securities, including the obligations of the United States or of any States thereof; to issue debentures, bonds and promissory notes, to accept bills or drafts drawn upon it, but in no event having liabilities outstanding thereon at any one time exceeding five times its capital stock and surplus; provided, however, that with the consent in writing of the Banking Commissioner they may have outstanding at any one time ten times the capital stock and surplus; and generally, to exercise such powers as are incidental to the powers conferred by this article.

Article 1513a permits any corporation to amend its articles of incorporation and thereby transform itself into a trust company by adopting the following purpose:

to act as trustee, executor, administrator, or guardian when designated by any person, corporation, or court to do so, and as agent for the performance of any lawful act, including the right to receive deposits made by agencies of the United States of America for the authorized account of any individual, and to act as attorney-in-fact for reciprocal or inter-insurance exchange, and to lend and accumulate money *without banking privileges,* when licensed under the provisions of Subtitle II of Title 79, Revised Civil Statutes of Texas, 1925, as amended.

(Emphasis added.) These statutory provisions are adopted verbatim as Article Three of CMT's restated articles of incorporation.

It is apparent from the foregoing cases and statutory scheme that CMT, although authorized to act as a trust company, was expressly prohibited from exercising "banking privileges." In interpreting similar language authorizing corporations to lend and borrow money without "banking privileges," the *Brenham Production* court concluded that the legislature must have intended the terms "banking privileges" to encompass more than the lending and borrowing of money. 264 S.W.2d at 97. Article 1513a does not empower trust companies to accept deposits like those accepted by a bank in the ordinary conduct of its business, and, because the acceptance of such deposits must be taken to be encompassed in the term "banking privileges," a trust company is prohibited from accepting such deposits. In the case of CMT, although the invested funds were denominated an "investment trust deposit" by the literature explaining CMT's Investment Trust Deposits program, it is plain that the funds represented nothing more than an investment similar in many respects to a corporate note when viewed from the investor's perspective. The transaction, while clothed as a trust arrangement, displays few, if any, elements that are characteristic of trusts in a classic sense. The state does not dispute this notion. Instead, as the Banking Commissioner testified, the state takes the position that CMT is the substantial equivalent of a bank because it was represented that invested funds were guaranteed by the U.S. Government, paid a fixed rate of interest over a stated term, could be withdrawn upon demand, and were backed to some extent by a cash reserve. Nevertheless, contrary to the state's claim and perhaps to CMT's own representations to the public, CMT did not and could not legally accept deposits. Consequently, CMT is neither authorized to do a banking business nor does it do a banking business. *See Gamble,* 39 F.2d at 450.

The state emphasizes the three tests laid out in *First American Bank & Trust Co.*

*v. George,* 540 F.2d 343 (8th Cir.), *cert. denied,* 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976), for determining whether an entity is excluded from seeking relief in bankruptcy. Said the court: "The entities excluded under Section 4 of the Bankruptcy Act have these things in common: (1) they are extensively regulated by well-organized departments of the states and of the United States; (2) they are subject to express statutory procedures for liquidation; and (3) the nature of their business is public or quasi-public and involves interests other than those of creditors." *Id.* at 349. It is true that trust companies are regulated by the state, and there exists a statutory procedure for their liquidation. *See* Tex.Rev.Civ.Stat.Ann. arts. 1513–1513a. A comparison of the Texas Banking Code with the two articles on trust companies, though recognizing that article 1513a applies various of the banking provisions to trust companies, reveals a much less comprehensive regulatory scheme with respect to such companies. Supervision by the state superintendent of banking has not been deemed sufficient to classify the entity as the substantial equivalent of a bank. *See, e.g., In re Prudence,* 79 F.2d at 79. The 1983 amendment to article 1513a arguably provides the Banking Commissioner with the authority to liquidate a trust company as if it were a state bank. But "[u]nder the state classification test, the provision of a statutory scheme for an entity's liquidation never has been deemed to be sufficient to classify that entity as one excluded under section 109(b)(2)." *In re Cash Currency Exchange, Inc.,* 762 F.2d at 551 (citing as an example *In re Prudence,* 79 F.2d at 79).

The last of the *First American* tests is whether the entity is involved in a business of a · public or quasi-public nature. The Banking Commissioner classified CMT's business as public in nature. Arguably the liquidation procedure applicable to trust companies weighs in favor of characterizing their business as public, while the less extensive state regulation might weigh against such a characterization. We reject such a mechanical assessment of the nature of the business of these trust compa-

nies. To the extent that a bank may accept deposits while a trust company cannot, the liquidation procedures applicable to both entities serve different interests. A state's overriding concern is with protection of the depositors—"the millions of persons who deal with [such entities] on the faith of the protection afforded by direct governmental supervision and control." *See In re Cash Currency Exchange, Inc.,* 762 F.2d at 551 (quoting *Woolsey v. Security Trust Co.,* 74 F.2d 334, 337 (5th Cir.1934)). Although funds may be at risk when a trust company, operating like CMT, becomes insolvent, it is doubtful whether these funds differ from other investments unprotected by state provision. We may examine the actual operations of a corporation in applying the state classification test. *See In re Prudence Co.,* 79 F.2d at 79. The state's concern to protect depositors could not operate to transform essentially private investments into public ones when the trust company itself was proscribed from even accepting deposits. This court finds that permitting trust companies to seek relief under the Bankruptcy Code does not violate the public interest.

In conclusion, under the state classification test, a Texas trust company, operating in the manner of CMT, is not the substantial equivalent of the excluded entities.

### 2. *The Independent Classification Test*

■ Under the independent classification test, bankruptcy courts construe section 109(b)(2) itself based upon their own definition of the words of the Bankruptcy Code. *See* 2 Collier on Bankruptcy ¶ 109.02, at 109–13; *see also In re Cash Currency Exchange, Inc.,* 762 F.2d at 551–52. This court adopts the construction of section 109(b)(2) to which the Seventh Circuit assented in *In re Cash Currency Exchange:*

> The entities excluded from being debtors under the Code are specifically enumerated. The general rule of statutory construction is that the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded. *Expressio unius est exclusio*

*alterius.* 2A Sutherland Statutory Construction § 47.23 (1973 & Supp. 1983). If Congress had intended to make the list of excluded entities illustrative rather than exhaustive, it could have used the rule of statutory construction found in the Bankruptcy Code which provides that the words " 'includes' and 'including' are not limiting." 11 U.S.C. § 102(3). Because Congress chose not to do so, we conclude that the list of excluded entities is intended to be exhaustive.

The term "banking corporation" in section 4(a) of the Bankruptcy Act was replaced with a list of the specific types of financial institutions excluded from seeking relief under the Bankruptcy Code. The legislative history of section 109(b)(2) indicates that the "banking corporation" exclusion was expanded in light of changes in the banking laws. H.R.Rep. No. 595, 95th Cong., 1st Sess. 318–19 (1977), U.S. Code Cong. & Admin. News, pp. 5787, 6275, 6276. Nevertheless, it seems clear that the expansion was not intended to bring those institutions which do not do a banking business within the ambit of the exclusion. The institutions listed all accept deposits, the essential function of a banking institution.

762 F.2d at 552. Trust companies like CMT do not do a banking business, and this court finds no basis for implicitly including them in a list of excluded institutions that purports to be exhaustive.

The last decade in the United States has witnessed the development of a wide range of business entities that perform many of the functions historically associated with banks, but which are not organized under the banking laws or legally authorized to accept deposits. If these entities are to be precluded from seeking relief under the federal bankruptcy laws, section 109(b)(2) of the Bankruptcy Code will need fine tuning in a manner that is the province of Congress. Until Congress acts, the long-held view of the courts—that the legal power to receive deposits is the essence of a "bank" within the meaning of section 109(b)(2)—should prevail.

Therefore, this court holds that CMT is not precluded from seeking bankruptcy relief by section 109(b)(2).

### B. *Authority to File the Bankruptcy Petition*

■ The state argues that Signorelli, the signator on the petition in bankruptcy, was without authority to act on behalf of CMT. The state reasons that, pursuant to articles 342–803 and –804, the Banking Commissioner's closing of CMT on June 28, 1985, operated to strip Signorelli of any authority to act on behalf of CMT as an officer or director. The state cites *Shaw v. McShane,* 33 S.W.2d 277 (Tex.Civ.App.— Austin 1931), *rev'd on other grounds,* 50 S.W.2d 278 (Tex.Comm'n App.1932, holding approved), for the proposition that the Banking Commissioner succeeds to the insolvent company's rights in taking over its assets, reasoning from this proposition that only the Commissioner had the right to file a petition in bankruptcy on behalf of CMT. This court finds that *Shaw* is inapposite and the state's contention without merit.

■ It has long been held that a corporation may not be precluded by state law from availing itself of federal bankruptcy law. *International Shoe Co. v. Pinkus,* 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929). In *In re Cash Currency Exchange,* the Seventh Circuit held "that the exclusivity of an administrative receiver's title to all assets under state law is irrelevant to the determination whether a particular entity may file for bankruptcy relief." 762 F.2d at 552. Said the court: "Title 11 suspends the operation of state insolvency laws except as to those classes of persons specifically excluded from being debtors under the Code." *Id.* Having held that currency exchanges were not akin to those entities precluded from being debtors by section 109(b)(2), the Seventh Circuit further held that state law could not prevent such entities from seeking relief in bankruptcy.

The Seventh Circuit's recent decision is no aberration. As long ago as 1935, Judge Swan observed that it was "well settled

that the appointment of receivers for a corporation [under state law] does not deprive its directors of the power to file a petition in bankruptcy." *In re Prudence Co.*, 79 F.2d at 80 (collecting cases). Congress' enactment of a comprehensive and uniform federal bankruptcy scheme is facilitated by such a holding. *See also Jordan v. Independent Energy Corp.*, 446 F.Supp. 516 (N.D.Tex.1978); *United States v. Royal Business Funds Corp.*, 29 B.R. 777, 779 (S.D.N.Y.), *aff'd*, 724 F.2d 12 (2d Cir.1983); *In re Greater Atlanta Apartment Hunter's Guide, Inc.*, 40 B.R. 29 (Bankr.N.D.Ga. 1984).

### C. Abstention

█ The state urges that the bankruptcy case and the instant adversary action be dismissed pursuant to section 305 of the Code, which provides in pertinent part: "The Court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension...." 11 U.S.C. § 305(a)(1). The decision whether to abstain is within the discretion of the bankruptcy court, and its decision is unreviewable. *See* 11 U.S.C. § 305(c); *In re Cash Currency Exchange Inc.*, 762 F.2d at 555–56.

"In evaluating the best interests of the creditors and the debtor, efficiency and economy of administration are primary considerations." *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr.S.D.N.Y. 1981). In *Starbuck*, the court held that continued administration of a Securities and Exchange Commission equity receivership would best serve the interests of the creditors and the debtor because the receivership was providing efficient and equitable distribution of the debtors' assets. The state argues that similar interests of efficiency and economy prevail in the instant proceeding such that the Banking Commissioner should be permitted to effectuate the statutory liquidation already begun.

█ This court finds *Starbuck* to be less than compelling as applied to the instant case since it involved debtors against whom involuntary Chapter 7 petitions had been filed, seeking liquidation and the equitable distribution of the debtors' assets. The goal of liquidation under Chapter 7 was found to be coextensive with that of the SEC receivership. In the instant action, which involves a debtor seeking to reorganize under Chapter 11 in contradistinction to the Banking Commissioner who is seeking to liquidate CMT, the *Starbuck* rationale is not persuasive. The interest of the debtor in attempting a reorganization outweighs any competing considerations of efficiency and economy that may exist.

Accordingly, this court declines to dismiss the proceedings pursuant to section 305.

### D. Bad Faith

Finally, the state contends that the bankruptcy case should be dismissed because the filing of the bankruptcy petition was no more than an attempt to circumvent the provisions of the temporary restraining order issued by the state court and the Texas provisions governing the liquidation of banks. This court reads this contention as urging bad faith on the part of CMT in filing the bankruptcy petition. The short answer is that there was no evidence submitted to this effect. Moreover, having held that CMT was eligible to be a Chapter 11 debtor and to seek relief in bankruptcy and that a petition in bankruptcy can be filed notwithstanding the pendency of a state receivership, this court would be hard pressed to find bad faith on the part of an entity merely exercising its right to file the bankruptcy petition.

### III.

### CONCLUSION

Having determined that CMT was not the substantial equivalent of a bank so as to render it ineligible to be a Chapter 11 debtor, that the signator on the petition possessed the authority to file the petition on behalf of CMT, and that abstention under section 305 was not appropriate, this court concludes that it has subject matter

jurisdiction over the instant adversary proceeding and that all matters pending in the proceeding should come on for hearing after proper notice is given. We note that the question posed by the instant case is a close one. The decision of this court is not intended in any way to deprecate the vigilant efforts of the Banking Commissioner in his attempt in this case to protect the public against what he deemed to be the hazardous and unsafe condition of an entity within his control; indeed we can only applaud those efforts.

However, for the foregoing reasons, the state's motion to dismiss is DENIED.