**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, Debtor.**

**Thomas E. DUVOISIN, Liquidating Trustee, Plaintiff,**

**v.**

**Hugh G. and Hazel ANDERSON, et al., Defendants.**

**Civ. A. No. 3–85–921.**

United States District Court,
E.D. Tennessee, N.D.

Jan. 16, 1986.

J. Thomas Jones, Bernstein, Susano, Stair & Cohen, John A. Lucas, Huton & Williams, Knoxville, Tenn., for plaintiff.

William C. Myers, Jr., Stephen P. Parson, Wagner & Myers, P.C., Knoxville, Tenn., for defendants.

## MEMORANDUM

EDGAR, District Judge.

These are adversary proceedings which were brought in Bankruptcy Court by the Trustee pursuant to 11 U.S.C. § 547 to collect avoidable preferences. These proceedings were withdrawn from the Bankruptcy Court by the District Court pursuant to 28 U.S.C. § 157(d).

The bankruptcy proceedings were initiated on March 10, 1983, when Southern Industrial Banking Corporation ("SIBC"), which was an industrial loan and thrift company chartered under then existing provisions of Tennessee Code Annotated § 45-5-101 *et seq.*, filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court confirmed a Plan of Reorganization (herein the "Plan") which became effective on January 20, 1984.

On February 14, 1983, the United American Bank ("UAB") in Knoxville, Tennessee had been declared insolvent and closed by the Tennessee Commissioner of Banking. The bank was controlled by Jake Butcher, brother of C.H. Butcher. There followed a "run" on SIBC. The defendants in these adversary proceedings withdrew their funds from SIBC in the 90 days before SIBC's Chapter 11 filing. Of the approximately 800 defendants, 207 did not withdraw all of their funds—but continued to hold SIBC investment certificates or passbooks at the time of the Chapter 11

filing. Of this group of defendants, 164 voted to approve the Plan, 20 voted against the Plan, and 23 did not vote. None of the other defendants received any formal notice of the Plan approval proceedings in the Bankruptcy Court. Several thousand individuals and entities were holders of SIBC investment certificates or passbook accounts when SIBC filed its Chapter 11 petition on March 10, 1983, and comprise the bulk of the unsecured creditors of SIBC who are the beneficiaries of the Plan approved in the Chapter 11 proceedings.

In furtherance of the Plan, SIBC in November, 1983, was converted to an industrial bank[1] for the purpose of merging, on January 30, 1984, into Bank of Commerce, Morristown, Tennessee, a state bank. Bank of Commerce, the surviving entity, became a subsidiary of a new entity, East Tennessee Bancorp. Unsecured creditors of SIBC received federally insured certificates of deposit in partial payment of their claims, convertible preferred stock in East Tennessee Bancorp, warrants to buy common stock in East Tennessee Bancorp, and contingent interest certificates entitling the holder to receive certain cash distributions as provided in the Plan.

The Plan provides for the establishment of a liquidation trust. One duty of the trustee of this trust (herein the "Trustee") is the recovery of avoidable preferences. Proceeds recovered by the Trustee directly benefit East Tennessee Bancorp and SIBC's unsecured creditors who hold contingent interest certificates and stock in East Tennessee Bancorp. There are other aspects of the Plan which are not here material.

The subject of these proceedings is the approximately eight hundred (800) lawsuits brought by the Trustee to recover alleged preferential transfers. The defendants in these lawsuits have raised numerous defenses. The primary defense is that the Bankruptcy Court (and this Court) lack jurisdiction because, it is contended, SIBC is

---

1. This was a new entity created under amendments to Tennessee Code Annotated which became effective July 1, 1983.

not an eligible debtor under 11 U.S.C. § 109(b)(2). The precise issues pertaining to this defense are identified in the pretrial order as follows:

    (a) Whether the doctrines of *res judicata*, collateral estoppel, or judicial estoppel bar the Defendants from raising this issue.

    (b) Whether SIBC was, on the date of the filing of its Chapter 11 petition, an eligible debtor under 11 U.S.C. § 109(b)(2).

    (c) Whether SIBC, by virtue of its conversion into an industrial bank or its merger into the Bank of Commerce, ceased to be an eligible debtor under 11 U.S.C. § 109(b)(2) prior to the commencement of these adversary proceedings, thereby divesting this Court of its power to grant the relief sought by the Liquidating Trustee in such adversary proceedings.

## I. *SIBC and the Industrial Loan and Thrift Companies Act.*

SIBC was chartered as a Tennessee corporation on September 28, 1929. The charter stated the corporation's purposes to be, among other things:

Lending money, discounting notes, issuing installment and paid up certificates as investments, and giving and taking real estate and other security therefor, charging and collecting a commission for lending money and doing and performing any and all acts usually done and performed by investment, savings, and loan companies....

SIBC operated as what was termed a "Morris Plan Bank" or "Morris Plan Company." Such a "bank" or "company" was designed to provide small loans, mostly consumer loans, to a segment of the public that normally would not be able to obtain financing.

In 1951, when the Tennessee Legislature enacted the Industrial Loan and Thrift Companies Act, SIBC amended its charter to become an industrial loan and thrift company. The Act provided that:

The term 'industrial loan and thrift company' as used in this chapter ... means any corporation formed or qualified under the provisions of this chapter or any existing corporation operating as a Morris Plan Company or a company doing a similar business at the time of its enactment....

SIBC operated as an industrial loan and thrift company under this statute until it filed its Chapter 11 petition on March 10, 1983.

The Industrial Loan and Thrift Companies Act prohibits industrial loan and thrift companies from using "the word bank or banking, trust company, or other term commonly used to describe a banking corporation in its name." T.C.A. § 45–5–302(1). However, since SIBC had the word "banking" in its name prior to the enactment of the 1951 Act, SIBC's use of the word "banking" in its name was permitted.

As an industrial loan and thrift company, SIBC issued "investment certificates" pursuant to the provisions of T.C.A. § 45–5–301 and § 45–5–304. These investment certificates were payable on a maturity date at a fixed rate of interest. The investment certificates contained an admonition that they were "not federally insured" and they advised purchasers that they were "available only for sale to and purchase by bona fide residents of Tennessee." Investment certificates carried an interest penalty if cashed in prior to maturity. In actual practice, SIBC allowed the certificates to be cashed in at any time prior to maturity— but did exact an interest penalty.

SIBC also offered two passbook accounts. Its "regular" passbook account was issued at a fixed rate of interest. Its "VIP" passbook account carried a variable interest rate and required a $5,000 minimum investment. SIBC reserved the right to require a 90-day notice in writing of the depositor's intention to withdraw funds. As a matter of general practice, however, SIBC did not exercise this right. The issuance of these passbook accounts appears to have been neither explicitly authorized nor prohibited by the Industrial Loan and

Thrift Companies Act. The rates offered by SIBC on its investment certificates and passbook accounts were generally higher than could be achieved on deposits at conventional banks and saving and loan associations in SIBC's area of operation. None of the funds held by SIBC were insured by the Federal Deposit Insurance Corporation ("FDIC") or any other governmental or private agency.

The Industrial Loan and Thrift Companies Act did prohibit SIBC and other industrial loan and thrift companies from accepting demand deposits subject to checking. In the words of the statute, SIBC lacked power to "Receive deposits of money subject to check, payable on demand, or payable unconditionally at a fixed time...." T.C.A. § 45–5–302(1). SIBC did maintain its own checking accounts at other banks. It would on occasion write its checks for holders of passbook accounts to payees designated by such holders. SIBC would then deduct the amount of the checks from the holders' passbook accounts.

SIBC, as an industrial loan and thrift company, was empowered to make loans and to "engage in the purchase, discount and rediscount of notes, security agreements or security interests or other indicia of security originating from the sale or purchase of property or services." T.C.A. § 45–5–301(6). At the time of the filing of the Chapter 11 petition, roughly one half of SIBC's loans were in the form of consumer installment loan obligations which it had purchased from retailers. The other half were more or less unsecured loans which had been made to individuals associated with C.H. Butcher, a principal stockholder of SIBC. Of the approximately $40,000,000 of loans in this category, the Trustee, at the time of the trial of this cause, had only been able to collect approximately $2,000,-000 to $3,000,000 of the loans in this latter category.

As distinguished from state chartered banks and saving and loan associations, there were no specific liquidation procedures available to industrial loan and thrift companies such as SIBC, although general common law procedures for an assignment for the benefit of creditors were available. T.C.A. § 47–13–101 et seq.

The Industrial Loan and Thrift Companies Act was amended effective July 1, 1983 (several months after SIBC had filed under Chapter 11 of the Bankruptcy Code). The new statute created two new entities in addition to the industrial loan and thrift company. Those entities were industrial banks and industrial investment companies. These new entities were to be supervised and liquidated as state banks. Industrial banks could issue "thrift" certificates which were insured by an agency of the United States Government. Industrial investment companies could also issue investment certificates which had theretofore been issued by industrial loan and thrift companies. Industrial loan and thrift companies under the amended statute are now limited to the issuance of loans and may not take deposits of any kind.

## II. SIBC's Eligibility as a Debtor: An Examination of § 109(b)(2).

The primary issue here is whether SIBC was an eligible debtor under 11 U.S.C. § 109(b)(2). The resolution of this issue calls upon the Court to analyze both federal and Tennessee law, as well as the nature of the "banking" business.

The bankruptcy power of the United States derives from Article I, Section 8, clause 7 of the United States Constitution. Within this grant of authority, Congress is free to legislate the rules and regulations, as well as the parameters of the bankruptcy process. See, Adair v. Bank of America Nat. Trust & Savings Assoc., 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889 (1938). In § 109(b)(2) of the Bankruptcy Code, Congress has declared that:

A person may be a debtor under chapter 7 of this title only if such person is not—

.     .     .     .     .

a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union, or industrial bank or

similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act....[2] 11 U.S.C. § 109(b)(2).

Congress, in chosing to exempt certain organizations or individuals from the operation of the bankruptcy laws, must be presumed to narrowly circumscribe the limits of this exemption. *Israel-British Bank (London) Ltd. v. FDIC*, 536 F.2d 509, 513 (2nd Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 486, 487, 50 L.Ed.2d 575 (1976). *See also* 2A N. Singer, *Sutherland Statutory Construction* § 47.23 (C. Sands 4th ed. 1984). Thus, the Court's responsibility is to ascertain whether SIBC fit the definition of one of the exempted entities listed in § 109(b)(2).

In the relatively few cases interpreting § 109(b)(2) and its predecessors, the courts have utilized two approaches to the problem of what entities fall within the confines of § 109(b)(2). These approaches examine the nature of the entity based on the law of the state of incorporation (the "state classification test") and the nature of the entity based upon an interpretation of the Bankruptcy Code language (the "independent classification test"). *See* 2 L. King, *Collier on Bankruptcy* ¶ 109.02 (1985). *See also In re Cash Currency Exchange, Inc.*, 762 F.2d 542 (7th Cir.1985); *First American Bank & Trust Co. v. George*, 540 F.2d 343 (8th Cir.), *cert. denied*, 429 U.S. 1011, 97 S.Ct. 634, 50 L.Ed.2d 620 (1976). The Court will utilize both tests to ascertain the status of SIBC.

### A. The State Classification Test

The state classification test seeks to determine either the specific organization of a bank under state laws or its treatment under the application of state law. The state classification test involves a number of factors, including a comparison of powers conferred upon the entity with entities clearly exempted under § 109(b)(2), the presence or absence of extensive state regulation over the entity, the existence of a specific liquidation scheme, and an analysis of whether the entity conducted business of a public or quasi-public nature. *Cash Currency Exchange*, 762 F.2d at 548; *see also First American Bank*, 540 F.2d at 349. The public nature of the business addresses interests other than those of creditors. *First American Bank*, 540 F.2d at 349.

SIBC was originally chartered in 1929 as a Morris Plan Bank. In subsequent charters, SIBC sought to retain "all the powers thereof" of a Morris Plan Bank but the significance and the validity of this language is uncertain. With certainty, SIBC did amend its charter in 1951 to become an Industrial Loan and Thrift Company and was subject to the provisions of Chapter 5 of Title 45 of the Tennessee Code.

As an industrial loan and thrift company, SIBC was empowered to do things such as lend money with or without security, charge interest at interest rates limited by the Legislature; to engage in the sale and resale of notes, to make commercial loans, and to issue investment certificates.[3] In-

**2.** 12 U.S.C. § 1813(h) reads: "The term 'insured bank' means any bank (including a foreign bank having an insured branch) the deposits of which are insured in accordance with the provisions of this chapter; and the term 'noninsured bank' means any bank the deposits of which are not so insured.

**3.** T.C.A. § 45–5–301 stated at the time of SIBC's filing: "General powers of registrants.—Any registrant under this chapter shall have the following powers: (1) To lend money, with or without security, and to take as security real or personal property, or both; (2) To charge interest at a nominal rate not in excess of seven and one-half percent (7 1/2%) per annum, ... (3) To charge loan charges, but subject to the limitations pro-

vided in § 45–4–403 ...; (4) To require at the expense of the borrower, insurance against the hazards to which any collateral used to secure the loan is subject ...; (5) To accept, but not to require, as additional collateral at the expense of the borrower, insurance against the hazards of death or disability ...; (6) To engage in the purchase, discount and rediscount of notes, security agreements or security interests or other indicia of security originating from the sale or purchase of property or services; (7) To make loans to dealers in motor vehicles, appliances and other chattels for the purpose of acquiring, stocking and offering for sale such merchandise and to take appropriate security therefore; (8) To purchase or otherwise acquire and to sell and negotiate drafts and acceptances drawn in

dustrial loan and thrift companies could not accept demand deposits, use the term "bank" in its name (SIBC excepted), or make loans extending over a period of more than 10 years.[4] One of the distinctive attributes of a commercial bank is the acceptance of demand deposits, usually in the form of checking deposits, and the making of commercial loans. SIBC could not and did not accept demand deposits.

The thrust of the powers granted and restrictions imposed by statute on industrial loan and thrift companies was protection of the consumer, *i.e.*, those people who received primarily small loans from industrial loan and thrift companies. On the other hand, the provisions of the Tennessee Code dealing with state banks are, and have been, directed more toward the protection of the depositor. In fact, the Tennessee Code had surprisingly few restraints at all on the operation of SIBC and other industrial loan and thrift companies. This state of affairs doubtless led to the extensive revision of the Industrial Loan and Thrift Companies Act in 1983, after the filing of the SIBC Chapter 11 petition.

The Court acknowledges that certain activities of SIBC probably made it look like a bank to the general public. SIBC did take what may loosely be called deposits—and it did lend money. It did not, however, take demand deposits subject to checking, and about half its loans were to Butcher family insiders and associates—to the extent that it might be said that SIBC was used by its owners primarily to provide cash for many of the owners' personal business deals, the furnishing of small loans or commercial loans to the public being secondary.

Defendants argue that SIBC acted as a bank when it engaged in "fed funds" transactions, which were described as the transfer of funds between it and other financial institutions such as banks. However, the only such transaction that there is any hard evidence of that could be construed as a "fed funds" transaction is a dubious chain of events wherein SIBC wound up swapping credit with the United American Bank of Knoxville, Tennessee, a bank controlled by Jake Butcher, brother of C.H. Butcher,

connection with the sale of personal property on account of the purchase price thereof and to take from the acceptors or holders of such drafts and acceptances as security therefor, with or without other collateral, choses in action or other evidences of indebtedness issued by it ...; (9) To issue investment certificates subject to the provisions of § 45–5–304; and (10) To have any and all powers, not specifically defined herein, which are granted by the laws of this state to corporations generally, except such as are inconsistent with the provisions of this chapter."

4. T.C.A. § 45–5–302 stated at the time of SIBC's filing: "General limitations on registrants.—No registrant under this chapter shall have the power to: (1) Receive deposits of money subject to check, payable on demand, or payable unconditionally at a fixed time; or to use the word bank or banking, trust company or other term commonly used to describe a banking corporation in its name; or to accept trusts or act as administrator, executor, testamentary or judicial trustee in any form; (2) Make any loan for an original principal sum of three hundred dollars ($300) or less for a term in excess of twenty-four (24) months, or make any loan for an original principal sum of more than three hundred dollars ($300) but less than one thousand

dollars ($1,000) for a term in excess of thirty-six (36) months ...; (3) Make any loan to one (1) person, firm or corporation for more than ten percent (10%) of the amount of the stated capital and surplus of such registrant, except that this limitation shall not apply to loans made pursuant to § 45–5–301(7); nor shall this limitation apply to a registrant which does not issue, sell and have outstanding investment certificates; (4) Require the purchase of its investment certificates by a borrower simultaneously with a loan transaction; (5) Deposit any of its funds with any other corporation unless such corporation has been designated as such depository by a vote of the majority of the directors ...; (6) Move an office until five (5) days' notice of the registrant's intention to move has been given to the commissioner ...; (7) Take an instrument in which blanks are left to be filled in after the loan is made; (8) Accept or procure willfully and knowingly a false financial statement from a borrower; (9) Use any unreasonable collection tactics ...; (10) Publish or distribute or cause to be published or distributed any false or misleading advertising; and (11) Use multiple agreements, including those with affiliated lenders, with the intent to obtain a higher effective rate of interest or greater charges than would otherwise be authorized by this chapter."

984

for the purpose of aiding United American Bank in the avoidance of certain banking regulations. This transaction did not make SIBC a bank.

The defendants would use the definition of deposits in T.C.A. § 45–1–103 in the broadest sense to apply to the investment certificates and passbooks issued by SIBC.[5] Defendants next look at T.C.A. § 45–2–1702 which provides that:

> The right to receive money on deposit and the right to pay out money on checks are hereby declared to be the exclusive privileges of the banking business.

The defendants then attempt to use this exclusivity provision, in light of the broad definition of deposits in T.C.A. § 45–1–103, to prove that SIBC was a bank under Tennessee law and, therefore, a bank for purposes of the Bankruptcy Act. This proves too much. The nature of the SIBC instruments is troubling because many in the general public might consider these instruments as ones typically issued by a "bank" or like institution. Yet, important differences exist. First, these instruments were not federally insured. Second, these instruments were clearly titled as things other than certificates of deposit. Third, no checks were drawn on SIBC itself but, rather, SIBC drew checks on banks for its own purposes and for the needs of customers. Fourth, the entity paid interest at rates higher than those found in the community at banks and other financial institutions. Fifth, the acts of SIBC may have been ultra vires. While in a very loose sense, these instruments represented money on deposit, they did not represent the kind of demand deposits that are characteristic of commercial banks.

A significant factor to be considered in applying the state classification test is whether the state provides a specific liquidation scheme. *In re Central Management Trust, Inc.*, 50 B.R. 1010, 13 Collier Bankr.Cas.2d 617, 628 (S.D.Tex.1985). As the Seventh Circuit in *Cash Currency Exchange* stated:

> The more comprehensive the liquidation scheme, the stronger the indication that the state sees a strong public interest in direct governmental supervision and control of the liquidation or dissolution of the institution. 762 F.2d at 551.

*See also Israel-British Bank Ltd.*, 536 F.2d at 514, 2 L. King *Collier on Bankruptcy* ¶ 109.02. The State of Tennessee did not provide a specific liquidation procedure for industrial loan and thrift companies. When SIBC became insolvent, the Tennessee Commissioner of Financial Institutions was without authority to do anything whatsoever to liquidate SIBC or to provide any sort of protection for depositors. *See, generally, In re CMT*, 50 B.R. 1010, 13 Collier Bankr., Cas.2d at 626. On the other hand, the state did provide specific liquidation procedures for state banks, T.C.A. §§ 45–2–1501 *et seq.*, and savings and loan associations. T.C.A. §§ 45–3–1201 *et seq.*

Some testimony was heard on the appearance of the physical facilities and how they affected the determination of whether the entity was a bank. The Court does not attach much significance to this proof. The Court is seeking to determine whether the activities of SIBC as viewed through the applicable law make SIBC one of the exempted entities under § 109(b)(2). The presence or absence of a regulation vault does not move the inquiry very far. In any event, the testimony indicated that despite the free standing nature of the SIBC facilities, most, if not all, branches lacked the devices typically associated with a bank or

5. T.C.A. § 45–1–103(7) states: "'Deposit' means a deposit of money, bonds or other things of value, creating a debtor-creditor relationship." The defendants suggest that, because the statute detailing the rules and regulations for industrial loan and thrift companies is part of the same title authorizing and regulating banks, any definition in the first part of the title discussing banks (Chapters 1 and 2) is applicable through-

out the title, and dispositive of any inquiry. The Court cannot accept this argument for to do so would then permit, for example, the ultra vires acts of a pawnbroker, defined in Chapter 6 of Title 45, to make it a bank under the Title. The Court must look to the facts at hand, and the applicable law, to determine whether SIBC was a bank.

similar institution such as operational cameras, silent alarms, regulation vaults, and other security devices.

It is regrettable that SIBC appeared to the public as a bank (although no depositor should have been under any illusion that SIBC deposits were insured); and it is regrettable, perhaps, that state law allowed something like SIBC to exist—but such factors do not transform SIBC into a bank for purposes of the Bankruptcy Act under the state classification test.

## B. *The Independent Classification Test*

The independent classification test determines the status of an entity solely under an interpretation of the language of § 109(b)(2). *See* 2 *Collier on Bankruptcy*, ¶ 109.02 at 109–13. It is necessary to employ this test because the state's treatment of SIBC is not necessarily dispositive. *First American Bank and Trust Co.*, 540 F.2d at 346. To rely exclusively on a state classification test would result in an abdication of a federal court's responsibility to interpret federal law.

The Garn-St. Germain Act, which became effective on October 15, 1982, added to § 109(b)(2) the words "industrial bank or similar institution which is an insured bank as defined in § 3(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1813(h)...." One purpose of Garn-St. Germain, which dealt with numerous portions of the federal banking laws as well as 11 U.S.C. § 109(b)(2), was to expand the availability of the insurance and liquidation procedures of the FDIC to "industrial banks and like type institutions." S.Rep. No. 97–536, 97th Cong. 2nd Sess. 71 (1982), U.S.Code Cong. & Admin.News 1982, at pp. 3054, 3125. Therefore, because this insurance, and presumably the accompanying FDIC liqui-

dation procedures, were made available to these entities, the Act provided that "an industrial bank or similar institution" which has FDIC insurance is excluded from bankruptcy.

▋ In order for SIBC to be an ineligible debtor without FDIC insurance, it must be a "bank" or one of the organizations other than an "industrial bank or similar institution" specifically mentioned in § 109(b)(2). As pointed out in the Court's "state classification test" analysis, SIBC, because it did not and could not accept demand deposits subject to checking, was not a commercial bank. The Court considers that the word "bank" as it appears in § 109(b)(2) without a qualifying adjective, refers to a commercial bank. Defendants asserted at the trial that SIBC was something between such a bank and an industrial bank, but offered no proof that it was a "savings bank," "cooperative bank" or one of the other organizations excluded from debtor status by § 109(b)(2). If SIBC fitted a description of any of the § 109(b)(2) organizations, it was an industrial bank, the kind of financial institution intended for the purpose of providing small loans to a blue collar market. Since SIBC did not have FDIC insurance, it was not an eligible debtor if it was an "industrial bank or similar institution." [6]

A final factor leading to the conclusion that SIBC was not excluded from bankruptcy by § 109(b)(2) is the legislative history of § 109(b)(2) which makes it clear that the "banking institutions and insurance companies engaged in business in this country are excluded from liquidation under the bankruptcy laws because they are bodies for which alternate provision is made for this liquidation under various

---

**6.** The defendants argue that the words "which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1813(h))" only modify the term "similar institution" and not "industrial bank." This construction is not consistent with the intent of Garn-St. Germain which was, the Court concludes, to make both "industrial banks" and "similar institutions" eligible for FDIC insurance. Furthermore, even if the insurance language only modifies "similar institutions," this

would not be significant since there is no means of making, on the record before this Court, any distinction between "an industrial bank" and a "similar institution."

The defendants appear to concede that there is no real difference between "industrial banks" and "similar institutions" when they state in their pretrial brief that the term industrial bank is synonymous with industrial investment companies as well as several other entities. Defendants' Pretrial Brief at 43.

state or federal regulatory laws." S.Rep. No. 989, 95th Cong. 2nd Sess. 31 (1978), U.S.Code Cong. & Admin.News 1978, at pp. 5787, 5817. As the Court has already noted, the Industrial Loan and Thrift Companies Act contained no special liquidation procedures for SIBC.

The wording of § 109(b)(2) and its legislative history lead to the conclusion that SIBC was not a "bank," as that term is used in the statute, and was therefore an eligible debtor under the Bankruptcy Code. Thus, under either the state classification test or the independent classification test, SIBC was an eligible debtor under 11 U.S.C. § 109(b)(2).

### III. *Other Issues.*

There are several other issues which were identified in the pretrial order for resolution by this Court. One such issue is whether the doctrines of res judicata, collateral estoppel or judicial estoppel bar the defendants from raising the issue of § 109(b)(2) eligibility. The plaintiff Trustee contends that the Bankruptcy Court's approval of the SIBC reorganization plan bars the defendants from raising this issue in defense to these preferential transfer suits. In view of the Court's disposition of the § 109 issue, this res judicata question need not now be addressed.

A final issue, which must be resolved, is defendants' contention that when SIBC was converted to an industrial bank pursuant to the plan of reorganization or when it was thereafter merged into the Bank of Commerce, this Court lost jurisdiction over these preference actions. Defendants argue that although such actions took place after the SIBC Chapter 11 petition was filed, they nonetheless occurred before these preference actions were filed.

The Sixth Circuit has recently held in *Comprehensive Accounting Corporation v. Pearson,* 773 F.2d 751 (6th Cir.1985), that events occurring after the filing of a Chapter 13 petition did not deprive the Bankruptcy Court of jurisdiction. The Sixth Circuit concluded that:

Post-petition events should not be considered because they often occur 'after the debtor and other parties in interest have expended relatively large amounts of time, money and effort towards the debtor's reorganization.' [cite omitted]. *Id.* at 756.

The court analogized the Chapter 13 eligibility issue to the rule that subject matter jurisdiction in diversity cases is not lost due to events occurring after the initiation of suit. The reasoning of the Sixth Circuit is persuasive in this case. There appears to be no substantive reason why this Court should treat a Chapter 11 petition differently from a Chapter 13 petition. This Court, therefore, holds that SIBC was an eligible debtor at the time the Chapter 11 petition was filed on March 10, 1983, and that subsequent changes in its corporate status had no effect upon the ability of the Trustee to bring these suits for preferential transfers. A contrary determination could very well be a hindrance to fashioning optimum plans of reorganization for the benefit of all interested parties in a Chapter 11 case.

### IV. *Conclusion.*

This Court does have subject matter jurisdiction over these suits to recover preferential transfers. However, the decision of the Court in this case does not necessarily determine with finality their ultimate result. An individual defendant may yet have valid defenses to the the Trustee's claim in a particular case. Other than the conclusions reached in this decision, this Court expresses no opinion regarding the merits of the Trustee's claims in the individual suits nor on the merits of any defenses thereto.

There are various motions and cross-motions for summary judgment, as well as other motions, pending in these cases. These motions involve the issues which have been decided by the Court in this decision as well as other issues. All matters which remain to be resolved with respect to pending motions, as well as all other issues in these cases, are best left to the special expertise of the Bankruptcy Court which will, of course, be guided by

this Court's decision. Accordingly, pursuant to 28 U.S.C. § 157, the cases which are listed on Exhibit A to the pretrial order will be re-referred to the Bankruptcy Court. An appropriate order will enter.