**In re BANKWEST BOULDER INDUS-
TRIAL BANK, a Colorado
corporation, Debtor.**

No. 87–B–14761–M.

United States Bankruptcy Court,
D. Colorado.

Jan. 29, 1988.

**560**

Garry R. Appel, Rothgerber, Appel, Powers & Johnson, Denver, Colo., for debtor.

Barbara M.A. Walker, Asst. Atty. Gen., Denver, Colo., for Colorado State Bank Commissioner.

Alan Harper, Denver, Colo., U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on a Motion to Dismiss or Abstain filed by the Colorado State Bank Commissioner ("Commissioner"), which Motion was joined by the Office of the United States Trustee ("U.S. Trustee"). The Industrial Bank Savings Guaranty Corporation ("IBSGC"), a non-profit corporation created by the Colorado Legislature to provide protection for customers' deposits in member Colorado industrial banks, filed an *amicus curiae* brief in support of the Motion to Dismiss. (These parties may collectively be referred to as the "State.")

The State maintains that the Debtor, Bankwest Boulder Industrial Bank ("Bankwest"), does not qualify as a debtor under Section 109(b)(2) and (d) of the Bankruptcy Code and is not eligible for relief pursuant to the Code. Essentially, the State asserts that as an industrial bank, or as a banking institution, Bankwest cannot obtain relief under the Bankruptcy Code and, as an alternative, it should be administered by the Commissioner and managed exclusively under state law.[1]

A hearing was scheduled and argument was heard in Open Court on January 13, 1988. No testimony or evidence was presented or offered by the State. The Commissioner, U.S. Trustee, and the Debtor were present. Significantly, no Bankwest creditors, and more particularly, no depositors were present ("Depositors").[2]

Pursuant to that hearing and based on a full and careful review of the record before the Court, the State's Motion to Dismiss or to Abstain is DENIED.

■■■ THE COURT FINDS AND CONCLUDES that, based on the pleadings, the briefs, and the arguments presented, (1) notice regarding the hearing on the Motion to Dismiss or Abstain was deficient, and (2) Bankwest qualifies as a debtor pursuant to 11 U.S.C. § 109(b) and (d) and is, under the current circumstances, entitled to relief as a debtor-in-possession in accordance with 11 U.S.C. § 1101 *et seq.*

THE COURT FURTHER CONCLUDES that the best interests of the Depositors, as well as those of the Debtor, are, again under the current circumstances, better served by this Court retaining jurisdiction over Bankwest.

This decision and these conclusions are based on the factors outlined below.

### NOTICE

The notice given to Depositors and other interested parties so they could be alerted to and be heard on the important issues involved in this case was fatally deficient. The opportunity for Bankwest Depositors to participate in the hearing was almost non-existent. The State failed to supply proper notice under the circumstances as required by statute, as well as by the United States Constitution.

The State seeks dismissal of the Chapter 11 case pursuant to 11 U.S.C. § 1112(b) which provides in pertinent part:

---

1. The State also proceeds pursuant to § 105(a). The extraordinary powers accorded to the Court under § 105 will not be invoked, however, without extraordinary and compelling reasons to do so. Those reasons are absent here.

2. Depositors, it appears to the Court, constitute the vast majority of creditors of Bankwest. While "creditors" may be the more formal and encompassing term, "Depositors" is used for the collective body of creditors because it is the more accurate and telling term in this situation.

[O]n request of a party-in-interest or the United States Trustee, *and after notice and a hearing,* the court may convert ... or ... may dismiss a case under this chapter whichever is in the best interest of creditors and the estate, for cause, including ... (emphasis added).

"Cause" to dismiss this case potentially includes many different reasons and circumstances which are embodied in the statute (11 U.S.C. § 1112(b)(1)–(10)). Cause also includes, naturally, the failure of Bankwest to qualify as a debtor under Section 109(b) and (d) of the Bankruptcy Code.

Dismissal of this industrial bank from Bankruptcy Court is a significant step. It could substantially affect the rights and remedies of all creditors and particularly those of the Depositors. It could impair the ability of Depositors to protect their respective interests, legal rights, and their savings, indeed for some their life savings.

Procedural due process and adequate notice to the Depositors are not mere courtesies to be dispensed with for the sake of convenience or simplicity. The United States Supreme Court has firmly implanted due process for litigants or adversaries as a right, not an option:

[A]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

*Reliable Elec. Co., Inc. v. Olson Const. Co.,* 726 F.2d 620, 622 (10th Cir.1984). The Tenth Circuit is equally clear in recognizing that in a reorganization case, "[a] fundamental right guaranteed by the Constitution is the opportunity to be heard when a property interest is at stake." *Id.* at 623.

■ General knowledge of a reorganization proceeding, or of a bankruptcy case, clearly does not substitute for notice and opportunity for a hearing. *Id.* at 622. In-

deed, it is fundamental that unsecured creditors are *entitled* to procedural due process and "[i]n a judicial proceeding due process requires that *individualized notice* be given before rights are affected." (Emphasis added.) *In re Blumer,* 66 B.R. 109, 114 (9th Cir. BAP 1986).

■ The applicable statute requires that dismissal of a case may be granted, but only "... after notice and hearing" (11 U.S.C. § 1112(b)). The phrase "notice and hearing" means "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances ..." (11 U.S.C. § 102(1)(A)). There is indeed flexibility in the statutory definition. Emergency circumstances or truly compelling reasons can justify abbreviated or limited notice as to time, content, or number of recipients. Those reasons are absent here.

"A trial court may act without a hearing if notice has been properly given and (1) a hearing has not been requested or (2) there is insufficient time for one. Nowhere, however, is there any provision for an action to be taken without notice where 'notice and hearing' are required." *Blumer, supra* at 113.

■ Notice must be reasonably designed to timely notify the recipients of the proposed action and to inform the recipient of the right to object and to request a hearing. Flexibility to adjust notice requirements is available. (*See,* Bankruptcy Rules 2002(*l*), 9006(c), 9007.) Recognizing that, however, limiting or restricting notice is to be sparingly used. Administrative convenience is not grounds to abbreviate notice in this, a contested matter. *In re Sandra Cotton, Inc.,* 65 B.R. 153 (W.D.N.Y.1986); B.R. 9014.

Not a single Depositor, creditor, or representative of Depositor or creditors committees, formal or informal, attended or participated in the January 13, 1988 proceedings. They were entitled to do so. At a minimum they were entitled to have adequate notice of the hearing so that they could avail themselves of the *opportunity* to participate in the hearing, if they chose to do so.

Unfortunately, they had virtually no notice; they thus had virtually no opportunity.

There was no testimony or evidence offered at the January 13, 1988 hearing that notice of the hearing was given to Depositors. The only document indicating that notice of the hearing was sent to creditors and Depositors was a December 7, 1987 "certificate of service." The certificate indicates only Twenty–One (21) persons were notified by mail of the hearing, and that list included the Bank's attorneys and persons living as far away as Florida and Oklahoma. Not a single recipient of the notice is identified as a Depositor. The Bank's schedules filed with the Court reveal that there are perhaps 900 Depositors and creditors of Bankwest. The Court can only conclude that perhaps Two Percent (2%) of the Depositors had any notice of the hearing.

The State argues that its notice was adequate because of (1) the existence of "exigent circumstances," (2) "the absence of a full list of creditors," and (3) a Court Order signed by Judge Brumbaugh, dated December 15, 1987, "Approving Procedural Matters and Granting Expedited Hearing." Each of the proffered reasons are either without foundation or merit.

First, the bald claim of the State that "exigent circumstances," or that emergency conditions existed which justified a restricted or limited notice have not been proved or otherwise demonstrated. No evidence was submitted to the Court, nor was an offer of proof forthcoming, to demonstrate "exigent circumstances" which would justify the restricted, limited notice. The State's anxiety and desire to move swiftly was exhibited, but not "exigent circumstances ... calling for immediate action or remedy." *Blacks Law Dictionary,* 683 (4th ed. 1968).

Second, the State's assertion that a "full list of creditors" was not available on December 7, 1987 and thus notice to perhaps Two Percent (2%) of the Depositors was sufficient, is equally shallow. On December 4, 1987, the Debtor filed with the Court a Forty–Six (46) page list of its Depositors and on December 10, 1987 an additional Twenty–Four (24) page list of Depositors was filed. The hearing, held over one month later on January 13, 1988, provided more than ample time to give adequate notice and the creditor lists provided ample identification of most, if not all, of the Depositors. While notice to *all* Depositors might not be warranted, notice by publication, notice to creditors' committees or representatives or notice at Depositors' meetings, could be adequate if notice by mail to all Depositors was not available. Instead, selective, limited and restricted notice was sent.

Third, the State obtained from Judge Brumbaugh a Court "Order Approving Procedural Matters and Granting Expedited Hearing" on December 15, 1987, under circumstances best described as questionable, and unjustified. Two examples of the circumstances are instructive. First, the very "Motion to Shorten Notice Procedure and to Approve Form and Method of Notice" ("Motion to Shorten Notice") that the State submitted to obtain limited notice was, itself, only mailed to the same select list of Twenty–One (21) persons that received the Motion to Dismiss. The Motion to Shorten Notice did *not* advise its recipients that an objection to or a request for a hearing on the Motion to Shorten Notice was available to Depositors. Quite the contrary, no notification, evidently, of the opportunity for hearing on the *procedure,* itself, was afforded to anyone.

The second example of questionable circumstances is that the State made misleading representations to Judge Brumbaugh on December 7, 1987 when requesting its "Order Approving Procedural Matters." The State's Motion recited that:

An expedited hearing in this matter, to be scheduled no later than December 15, 1987, is in the best interest of the Commissioner, the depositors of the debtor and all parties in interest. The failure to obtain prompt approval of this Motion may result in depositors of the debtor being denied participation in the Commissioner's plan of liquidation of industrial banks in his possession.... *The Commissioner intends to finalize his plan*

of liquidation of the industrial banks in his possession by December 15, 1987 (State's Motion, page 6) (emphasis added).

At the January 13, 1988 hearing the State, again, failed to supply any evidence, offers of proof or, indeed, any representations of counsel that the Commissioner *had any plan* at all for the reorganization or liquidation of Bankwest, let alone a plan that could be deemed feasible, sensible, successful or final. The Court had been misled into signing the Order approving restricted, limited notice to Depositors by inaccurate representations as to the urgency of the situation and the State's plan and capacity to perform a successful liquidation.

The process engineered by the State was, in effect, an *ex parte* effort by the State to limit notice to Depositors and a conforming *ex parte* Order granted by the Court under misleading circumstances.

### QUALIFYING AS A CHAPTER 11 DEBTOR

Aside from deficiencies in notice and procedure identified above, Bankwest qualifies as a debtor-in-possession under Section 109 of the Bankruptcy Code (11 U.S.C. § 109). It may, and now must, proceed promptly to try and effect a successful *reorganization* of its financial affairs. Failure to do so will necessarily result in liquidation under state or federal law.

*Statutory Construction.* Section 109 of the Bankruptcy Code, denoted "who may be a debtor" provides, in pertinent part, that virtually any legal "person," or entity, residing in the United States may be a Chapter 11 debtor except particular persons, or entities, which are specifically identified in subsections (d) and (b) of Section 109. Those persons specifically identified as *not* qualifying for relief include, among others,

(b)(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union, *or industrial bank or other similar institution which is an*

*insured bank as defined in section 3(h) of the Federal Deposit Insurance Act* ... (12 U.S.C. § 1813(h)) (emphasis added) (11 U.S.C. § 109(b)(2)).

The State argues that this language is clear, at least in its intent, and unambiguous in its purpose: the Bankruptcy Code precludes an industrial bank, either as a bank or as an industrial bank, from serving as a Chapter 11 debtor. The Court does not, however, understand this language with the same clarity or purpose as does the State.

The statute does not provide clear and precise definitions or guidelines and the case law does not supply certainty in precedent as to whether or not Bankwest is precluded from qualifying as a Chapter 11 debtor. The Court does have guidance in its interpretation of the statute, however:

> Absent precise statutory definitions and clarifying legislative history, courts were free to take 'a reasonable and flexible approach' to the matter of eligibility for bankruptcy relief and 'should be guided largely by the question of whether a bankruptcy proceeding is a *satisfactory method* of liquidating the corporation under consideration.' *Collier on Bankruptcy*, Section 4.05(2) at 592, 593 (14th Ed.1975) (emphasis added); *In re Republic Trust & Savings Co.*, 59 B.R. 606, 611 (N.D.Okla.1986).

In terms of statutory construction, the actual words of Section 109 do appear rather precise: a person may be a debtor " ... only if such person is not ... (an) industrial bank or similar institution which is an insured bank as defined in Section 3(h) of the Federal Deposit Insurance Act." The last clause, unbroken by a comma which could modify its meaning, expressly excludes from Bankruptcy Code relief an " ... industrial bank or similar institution which is an insured bank ...." Implicit in this language is the converse proposition that an industrial bank which *is not* insured by the Federal Deposit Insurance Corporation *can* qualify as and be a Chapter 11 debtor. *Id.* at 614.

Bankwest is *not* "...an insured bank as defined in Section 3(h) of the Federal Deposit Insurance Act." That was a factual representation and an offer of proof made by the Debtor and not disputed by the State. By definition, consequently, Bankwest appears to qualify as a Chapter 11 debtor. The result is almost inescapable.

When statutory language is clear and unequivocal, then reliance on legislative history is inappropriate absent some rare and exceptional circumstances. *Wilson v. Harris Trust and Savings Bank*, 777 F.2d 1246, 1249 (7th Cir.1985). Further, rules of statutory construction mandate that the words of a statute must be given their plain meaning and the Court should not adopt a different construction absent clear legislative intent to the contrary. *U.S. v. Mayberry*, 774 F.2d 1018 (10th Cir.1985); *In re Storage Technology Corp.*, 48 B.R. 862 (D.Colo.1985).

This Court feels bound to apply the plain meaning of the words of the statute and accord to Bankwest, an industrial bank *not* insured by Section 3(h) of the Federal Deposit Insurance Act, the right to qualify as a Chapter 11 debtor-in-possession.

*Available Tests to Determine Eligibility of an Industrial Bank.* There is little case law to help the Court determine whether or not Bankwest is eligible to file for reorganization under Chapter 11. There are, however, three previously recognized "tests" which have been of help in deciding whether or not a banking or savings entity qualifies for Chapter 11: the "state classification test," the "independent classification test," and the "alternate relief test." *Republic Trust, supra* at 606; *In re Southern Industrial Banking Corp.*, 59 B.R. 978 (E.D.Tenn.1986).

The *"state classification test"* attempts to discern what the state intention and scheme is for banks and lending institutions. This test is somewhat illusory in that the state scheme cannot override Congress' own intention as to who is eligible for bankruptcy relief. *Republic Trust, supra* at 611. Nonetheless, a look at the state statute is important.

Industrial banks in Colorado are created and governed by Title 11, Article 22 of the Colorado Revised Statutes. The state statute is a comprehensive blueprint for chartering, monitoring, managing, and liquidating an independent and distinct class of lending institutions called "industrial banks." The blueprint includes provisions for authority and powers of the "State Bank Commissioner" and establishment of the Industrial Bank Savings Guaranty Corporation ("IBSGC") (C.R.S. §§ 11–22–109 and 302). It defines and grants "special powers" to industrial banks and prohibits industrial banks from exercising certain so-called "forbidden powers" (C.R.S. §§ 11–22–107, 108). Significantly, industrial banks are forbidden to offer "demand bank accounts," more commonly known as "checking accounts," a recognized hallmark of a true banking institution. *See, Southern Industrial Bank, supra* at 983–984; *Republic Trust, supra* at 613.

For bankruptcy purposes, two sections of the state statute are of key importance. First, the responsibility and powers granted to the Commissioner are crucial, particularly those regarding financially troubled industrial banks and reorganization or liquidation of same. In a failed or failing industrial bank, the Commissioner is vested with "... full and exclusive power and control ..." to manage the affairs and liquidate an industrial bank (C.R.S. § 11–22–602). The grant of authority is sweeping and detailed. The state Commissioner is now exercising some of those powers. It is noteworthy, indeed it may be decisive, that for failed or failing industrial banks, the statutory language and the Commissioner's powers appear exclusively devoted to liquidations and not to reorganizations (C.R.S. § 11–22–601 *et seq.*).

A second key section relevant to bankruptcy is that which establishes and controls the IBSGC (C.R.S. §§ 11–22–201 and 517). The IBSGC was created "... to *guarantee full payment* of savings obligations of members up to $10,000.00 for each account ..." (C.R.S. § 11–22–301). The Commissioner is, again, vested with sweeping statutory powers to monitor the corporation, maintain its integrity, and en-

force its charter and obligations, i.e. to protect the Depositors' savings (C.R.S. §§ 11–22–304, 503 and 513).

A fair reading of the comprehensive statutory provisions respecting Colorado industrial banks compels this Court to conclude that the state of Colorado classifies Bankwest an industrial bank and not as a bank; that the distinction is not in name only but involves distinctive powers and business activities and for purposes of this test, Bankwest should be considered an *industrial bank. Republic Trust, supra* at 612. Moreover, it is the obvious intent of the state statute to relegate exclusive and comprehensive powers to the Commissioner to manage industrial banks. It is also fair to conclude that the state statutory scheme dealing with financially distressed industrial banks is exclusively designed to liquidate and dissolve those institutions rather than employ other, perhaps rehabilitative regulatory measures.

The *"independent classification test"* attempts to determine the status of an entity solely under an interpretation of the language and definitions of Section 109(b)(2). It requires some of the same considerations discussed above in "statutory construction." This test includes an examination of the powers and activities of this Debtor as against the powers and activities generally associated with "banks" and other categories of entities excluded from eligibility for bankruptcy relief by 11 U.S.C. § 109(b)(2). *Republic Trust, supra* at 613; *Southern Indus. Banking Corp., supra* at 985; *See,* 2 *Collier on Bankruptcy,* para. 109.02 at 109–13.

The analysis found in *Southern Indus. Banking Corp.* as to the language used in Section 109(b)(2), is instructive:

> The Garn–St. Germain Act, which became effective on October 15, 1982, added to § 109(b)(2) the words 'industrial bank or similar institution which is an insured bank as defined in § 3(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1813(h) ...' One purpose of the Garn–St. Germain, which dealt with numerous portions of the federal banking laws as well as 11 U.S.C. § 109(b)(2), was to ex-

pand the availability of the insurance and liquidation procedures of the FDIC to 'industrial banks and like type institutions.' S.Rep. No. 97–536, 97th Cong. 2nd Sess. 71 (1982), U.S.Code Cong. & Admin.News 1982, at pp. 3054, 3125. Therefore, because this insurance, and presumably the accompanying FDIC liquidation procedures, were made available to these entities, the Act provided that "an industrial bank or similar institution" which has FDIC insurance is excluded from bankruptcy.

FDIC insurance and its concomitant liquidation procedures were thus expanded to cover more institutions and give greater federal coverage and protection to certain institutional depositors. For those "... industrial banks and similar institutions ..." which availed themselves of the FDIC insurance coverage, they were denied access to the Bankruptcy Code, denied eligibility to be a Chapter 11 debtor. For those specified institutions which did *not* qualify or avail themselves of the expanded FDIC insurance coverage they were not precluded from access to the Bankruptcy Code or excluded from eligibility as a Chapter 11 debtor.

Bankwest is an *industrial* bank by virtue of state law, its state charter, and its specialized, sometimes limited, banking functions. It is not a bank, per se, and under the Bankruptcy Code or other federal law, there is no flexibility, precedent or justification to classify it as a "bank" or anything other than what the state intended, an industrial bank. As such, it is within the ambit of the Section 109(b)(2) phrase "... industrial bank or similar institution which is an insured bank as defined ..." thus rendering it eligible under the independent classification test for Bankruptcy Code protection.

A third test used to interpret eligibility for bankruptcy protection under Section 109(b)(2) is the *"alternate relief test."* This test is, as it implies, one which allows the Court to weigh the relative method and merit of alternative reorganization or liquidation systems available under state and federal law. It is, in the Court's opinion,

the most useful test and the one on which this Court most heavily relies.

The central issue under this test, as recognized in the State's brief, is whether or not "... a bankruptcy proceeding is a satisfactory method, compared with available state and federal non-bankruptcy methods of reorganizing or liquidating a would-be debtor." *Republic Trust, supra* at 614. *See,* State's Brief, page 3. Stated more directly, is Chapter 11 a *satisfactory* alternative method of reorganizing or liquidating an industrial bank in Colorado?

The analysis and resolution of this central issue necessarily requires consideration of Congressional intent, factors of practicality and policy, and the availability and utility of alternative methods. *Republic Trust, supra* at 614. Congressional intent was previously addressed in brief, in the independent classification test.

The State's position has three central themes. First, the State vigorously asserts that the state statutory scheme is best because it provides an "extensive," detailed and, most important, effective method of liquidating industrial banks. Second, the State maintains the system has superior merit particularly because it is "designed" to handle failed or failing industrial banks and it embraces extraordinary powers which are accorded to the Commissioner to effect timely and successful liquidations. Finally, the State urges that Depositors are best served in a state procedure because of their status as priority claimants and the existence of the IBSGC fund.

Each of the State's arguments may be meritorious, to a greater or lesser degree. The Court acknowledges that, indeed, the State of Colorado and specifically its Bank Commissioner may well have the statutory authority, capacity and plan to effectively and successfully liquidate Bankwest. As stated before, however, all state statutory provisions, and the Commissioner's plans for Depositors, are devoted exclusively to liquidate and dissolve Bankwest, not rehabilitate or reorganize.

There is no credible evidence or offer of proof before this Court that demonstrates the State of Colorado has a plan, even a primitive plan, to effectively and successfully reorganize this industrial bank or to profitably liquidate Bankwest. There is, indeed, no evidence whatsoever, and there has been no offer of proof made, that the Commissioner, within the ambit of the state's authority to deal with failing industrial banks, has a proposal to rehabilitate Bankwest, or any of the failed industrial banks, for that matter. Finally, and most important, the Commissioner has not offered to the Court any evidence that the State of Colorado is better able in its extensive regulatory scheme to provide a framework within which the banks' Depositors' rights can be forcefully asserted, their interests effectively protected, and their savings successfully recovered.

Each of these observations based on the hearing before the Court without Depositor participation, is reinforced by the following conclusions.

First, the state statutory scheme for industrial banks is, admittedly, extensive. It includes a panoply of powers for the Commissioner to deal with failing industrial banks. It also includes elaborate authority for the Commissioner to charter, approve, monitor, and regulate the industrial banks and the Depositors' guaranty fund, all for the purpose of maintaining the integrity of the banks and the sufficiency of the IBSGC guaranty fund (C.R.S. § 11–22–101 to § 11–22–610). Indeed, the Commissioner is specifically vested with the responsibility and the tools to (1) monitor, regulate, and maintain the viability of industrial banks (C.R.S. § 11–22–109) and (2) control the IBSGC for the purpose of protecting the integrity of that system and insuring the adequacy of the Depositors' guaranty fund (C.R.S. §§ 11–22–304, 401, 503, and 513).

The absence of any evidence presented to the Court demonstrating effective or successful use of those statutory tools, coupled with the verbal representation of the State's counsel reflecting feeble and incomplete reorganization or liquidation plans in place today, leads the Court to conclude only that the vast regulatory power of the Commissioner certainly has not, thus far, been effectively or successfully exercised.

Second, the state statutory scheme to deal with failed or failing industrial banks is, it appears, designed *exclusively to liquidate and dissolve* not to reorganize and rehabilitate those of the banks (C.R.S. §§ 11–22–601 to 610). There are almost no statutory provisions or procedures for effecting a reorganization and those few that exist are, in this Court's opinion, bare and insufficient, particularly in comparison to the Bankruptcy Code. (*See,* C.R.S. §§ 11–22–602 and 610.)

Third, even a casual comparison of the state statute and the federal law reveals a more potent, flexible and potentially rewarding set of powers in the reorganization of an industrial bank as compared to a State liquidation. The Bankruptcy Code, and this Court, can afford the Depositors authority and a forum to undertake the following steps if they choose to do so:

a. Establish a working creditors' committee.

b. Employ an examiner or perhaps a trustee to investigate and/or perhaps to manage the affairs of Bankwest.

c. Employ independent counsel, an accountant or other necessary persons to pursue Depositors' rights and protect their collective interests.

d. Demand and receive answers to questions about why and how Bankwest failed and analyze questions of responsibility and liability for that failure, if any.

e. Seek to recover fraudulent, preferential or other avoidable transfers of bank assets, if any.

f. Participate in and coordinate with bank ownership in the ongoing reorganization and rehabilitation efforts. (Noteworthy is the representation of counsel for Bankwest that current negotiations with the Federal Savings & Loan Insurance Corporation ("FSLIC) indicate a "realistic" possibility of 100% payback to Depositors through FSLIC within Sixty (60) to Ninety (90) days. While only speculation, Bankwest has established a timeline and ostensibly a "realistic" goal.)

g. Submit and perhaps obtain confirmation of a creditors' plan of reorganization or liquidation.

h. File a new motion to dismiss or to convert the pending Bankwest Chapter 11, whichever is more appropriate and in the Depositors best interests.

The powers and opportunities afforded to the Depositors under the Bankruptcy Code and outlined above, appear to either not be available to the Depositors in the state liquidation program or, alternatively, the Commissioner has thus far elected to not exercise those powers and opportunities for the Depositors. There was, at least, no evidence and, again, no offers of proof to that effect submitted by the State at the hearing.

For these various reasons, this Court can answer yes to the question "is Chapter 11 a satisfactory alternative method of reorganizing or liquidating an industrial bank in Colorado." Under the alternative relief test, particularly with respect to reorganizing rather than liquidating a failing industrial bank, Chapter 11 is a suitable, available alternative.

Chapter 11 can provide a framework in which the Debtor and the Depositors may exercise their respective rights and aggressively seek out timely, suitable alternatives to a state liquidation, *if* any are available. In the event either the Debtor or Depositors can identify and effectuate an alternative to the State's liquidation efforts, then their interests will be well served. If they do not, then either the Depositors, Bankwest, or the State may again seek dismissal of this case and avail themselves of their state rights and remedies. The choice can and should be, in large measure, that of the Depositors, as well as of the Debtor.

This Court is not expressing any opinion as to whether or not a reorganization of Bankwest under the Bankruptcy Code is available or feasible. Further, the Court has no opinion as to whether a reorganization under the Bankruptcy Code or a liquidation under state law is in the Depositors best interests. This is exclusively for the Depositors to decide. However, without

any participation by the Depositors in these proceedings, the Court cannot know what the Depositors believe to be in their best interests and consequently cannot act in accord with what they determine might be in their best interests.

## CONCLUSION

The Court renders this opinion and enters the following orders based on the existing circumstances and evidence presently before it. The Court is mindful that circumstances may change, the State might design and propose a promising plan of reorganization, the Depositors may seek dismissal of the Chapter 11 or, perhaps, the Commissioner will provide evidence of an aggressive, superior scheme to protect the Depositors interests and timely return all or a fair portion of the Depositors savings. Any of these events, or others not recited here may well be grounds on which the Court would either abstain from further hearing, or perhaps, dismiss the Bankwest Chapter 11. As the State's responsible officer, the Court trusts that the Commissioner will bring such changed circumstances to the Court's attention for appropriate consideration. Alternatively, the Court expects the Depositors or the Debtor to do so.

IT IS ORDERED that the State's Motion to Dismiss or Abstain is DENIED.

IT IS FURTHER ORDERED that Bankwest is deemed to qualify as a Debtor pursuant to Section 109(b) and (d) of the Bankruptcy Code (11 U.S.C. § 109(b) and (d)).

IT IS FURTHER ORDERED that the United States Trustee promptly appoint a committee of creditors pursuant to 11 U.S. C. § 1102(a)(1) taking care to assure full and meaningful representation on that committee of Bankwest Depositors. In the event Depositor representation on the creditors' committee is not adequate and/or any party-in-interest, including the United States Trustee, requests an additional and separate Depositors' committee, then the Court will timely consider such request pursuant to 11 U.S.C. § 1102(a)(2).